IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION

MICHAEL HASTINGS                                                                                    PLAINTIFF

v.                                         NO. 2:12CV00095 JMM/HDY

BOBBY MAY, JOHNNIE JONES,                                                              DEFENDANTS
GENE WINGO, and OTIS SMITH

FINDINGS AND RECOMMENDATION

INSTRUCTIONS

The following findings and recommendation have been sent to United States District Judge James M. Moody. Any party may serve and file written objections to these findings and recommendation. Objections should be specific and should include the factual or legal basis for the objection. If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection. An original and one copy of your objections must be received in the Office of the United States District Court Clerk no later than fourteen (14) days from the date of the findings and recommendation. The copy will be furnished to the opposing party. Failure to file timely objections may result in a waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the District Judge, you must, at the same time that you file your written objections, include the following:

1. Why the record made before the Magistrate Judge is inadequate.

2. Why the evidence proffered at the hearing before the District Judge (if such a hearing is granted) was not offered at the hearing before the Magistrate Judge.

3. The details of any testimony desired to be introduced at the hearing before the District Judge in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

>Clerk, United States District Court
>Eastern District of Arkansas
>600 West Capitol Avenue, Suite A149
>Little Rock, Arkansas 72201-3325

RECOMMENDATION

<u>INTRODUCTION</u>. Defendants Bobby May ("May"), Johnnie Jones ("Jones"), Gene Wingo ("Wingo"), and Otis Smith ("Smith") have filed the pending joint motion for summary judgment. <u>See</u> Document 75.[1] For the reasons that follow, the undersigned recommends that the motion be granted, the <u>pro se</u> complaint filed by plaintiff Michael Hastings ("Hastings") be dismissed, and judgment be entered for the defendants.

<u>FACTS</u>. The defendants have filed a statement of material facts in accordance with Local Rule 56.1(a).[2] Hastings has not responded to the defendants' submission by filing a statement of material facts in accordance with Local Rule 56.1(b).[3] Instead, he has filed several notices and exhibits that appear to address, in part, the defendants' motion for summary judgment. Liberally construing those submissions, it appears that he is attempting to place certain facts in dispute. On the basis of the defendants' statement of material facts, and Hastings various notices and exhibits, the undersigned finds the undisputed facts to be as follows:

---

[1] Rule 56(a) provides, in part, that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

[2] Local Rule 56.1(a) requires the moving party to "annex to the notice of motion a separate, short an concise statement of the material facts as to which it contends there is no genuine dispute to be tried."

[3] Local Rule 56.1(b) requires the non-moving party to file, in addition to any response and brief, a "separate, short and concise statement of the material facts as to which it contends a genuine issue exists to be tried."

1. On April 30, 2012, Hastings was booked into the St. Francis County Detention Center ("Detention Center") in Forrest City, Arkansas. See Document 77, Exhibit B at 1.

2. The following day, he complained of a foot problem and requested medical attention for his problem. See Document 77, Exhibit B at 1.

3. Before the day was out, he was seen for his foot problem by a medical professional at the Detention Center's "mobile clinic." See Document 77, Exhibit A at 44; Document 77, Exhibit B at 1.

4. Hastings began attempting to contact members of his family in an effort to obtain his seizure medication. See Document 77, Exhibit A at 37.

5. With specific regard to his effort, he testified to the following in his deposition:

> Q. Okay. All right. Now, you talked about your family bringing a medication in.
>
> A. Yeah, I was trying to get in touch with my sister and my mother. I couldn't get in touch with them for a few days. Before I had the seizure, I couldn't get in touch with anybody.
>
> I got in touch with Aunt Mimi. She was looking through my bag at her house, which is Terry Smith. You can write her down. … She said when I–they let me go down to the booking desk and call her. She said, "Baby, I've been looking, but I can't find any of your bottles in your bag." And my sister had been there a couple of days prior to that, and I don't know if my sister got them or what happened to them.
>
> But I tried to get in touch with my sister and I couldn't get her on the phone. My mother is a, what they call, CNA, so she works at different places at night and during the daytime. So I couldn't–I couldn't catch her. So I was going a few days without my medication, but I was trying to get it up there to me by my family.

> Q. Okay. All right. Did they ever bring it to you?
>
> A. No. …

See Document 77, Exhibit A at 37-38.

    6. On May 6, 2012, Hastings had a seizure that caused him to lose consciousness. See Document 77, Exhibit A at 12; Document 77, Exhibit B at 1.

    7. When he regained consciousness, he first observed three paramedics standing over and/or near him. See Document 77, Exhibit A at 12; Document 77, Exhibit A at 18-19.

    8. He does not recall the paramedics doing anything to treat the symptoms and/or consequences of his seizure. See Document 77, Exhibit A at 82.

    9. He only remembers that one of the paramedics accused him of faking the seizure. See Document 77, Exhibit A at 12-13, 82-83.

    10. Hastings was not taken for emergency room care, and he does not know who made the decision not to take him. See Document 77, Exhibit A at 83.

    11. When he regained consciousness, he also observed that he was laying on the floor in the "dayroom area of B cell," see Document 77, Exhibit A at 41, an area separate from the individual cell he resided in, see Document 77, Exhibit A at 51-52.

    12. He awoke "right there by the sewer-by the drain, the shower, there's a drain. And my left leg was completely covered by the sewer that was coming up out of the floor." See Document 77, Exhibit A at 41.

13. On May 7, 2012, or the day after Hastings suffered his seizure, he submitted a medical request for seizure medication and for medical attention for his back. See Document 77, Exhibit A at 30; Exhibit 77, Exhibit B at 2; Document 86, Exhibit 1.[4]

14. Jones contacted the Arkansas Department of Correction ("ADC") to determine if ADC officials had any record of Hastings being prescribed or taking seizure medication. See Document 77, Exhibit B at 2.

15. She was told that their records did not indicate he had been prescribed or had taken seizure medication. See Document 77, Exhibit B at 2.

16. The information Jones received was not accurate; Hastings had, in fact, been prescribed and had been taking seizure medication. See Documents 87, 88, 90, 91.

17. On May 8, 2012, or two days after Hastings suffered his seizure, he was seen by a medical professional at the Detention Center's "mobile clinic." See Document 77, Exhibit A at 30-31; Document 77, Exhibit B at 2.

18. During the visit, Hastings received seizure medication he identified as Dilantin. See Document 77, Exhibit A at 31, 39.

19. He asked that his back problem be addressed, but the medical professional refused. See Document 77, Exhibit A at 31.

20. The medical professional said he could not see Hastings about it, specifically stating that he was told not to address it. See Document 77, Exhibit A at 31.

---

[4] Hastings apparently injured his back when he fell to the floor during his seizure. See Document 77, Exhibit A at 30.

21. In the days following Hastings' seizure, he asked jail officials for standardized forms that would enable him to commence litigation pursuant to 42 U.S.C. 1983. <u>See</u> Document 77, Exhibit A at 72.[5]

22. He testified during his deposition that the following transpired when he asked for the appropriate forms:

> A. I had asked–the first person I asked was Mr. Petis … I asked for a 1983. He said, "Let me go and see if I can find one." He come back and said, "We don't have them on file."
>
> So the next day, Harden came to work. They called him Goldberg, black guy. I said, "Look, I need a 1983 form."
>
> He goes up front and comes back, "We don't have them up there."
>
> [Defendant] Otis [Smith] comes back there, "Why do you want that for? You're ain't going to do nothing but get yourself in trouble, some more trouble."
>
> "I didn't ask you all that, Otis. I need a 1983 form."
>
> "Well, tell me what's on the front page."
>
> So I explained it. I described the front page of a 1983 form. … He slams the door in my face. He goes up front and Chisolm comes back there, the other jailer.
>
> "Hastings, we ain't got no 1983 forms up there, man. We ain't got none on file."

<u>See</u> Document 77, Exhibit A at 72-73.

---

[5] Hastings wanted to commence litigation because he had been temporarily house with a prisoner who had tuberculosis, a prisoner Hastings identified as his mother's boyfriend. <u>See</u> Transcript at 73-74.

23. On May 11, 2012, or after spending only twelve days in the Detention Center, Hastings was transferred to the ADC's Omega Technical Violators Program in Malvern, Arkansas. See Document 77, Exhibit A at 7; Document 77, Exhibit B at 2.

24. As he was being placed in an ADC vehicle to be transported, he was cursed at by Smith. See Document 77, Exhibit A at 28-29.

PLEADINGS. Hastings commenced the case at bar by filing a complaint pursuant to 42 U.S.C. 1983 and joining May, Jones, Wingo, and Smith.[6] Liberally construing Hastings' complaint, he alleged that the defendants violated a number of his constitutional right, specifically, they are alleged to have violated the following constitutional rights: (1) they prevented him from obtaining his seizure medication and even gave him another prisoner's medication; (2) they failed to ensure that he received adequate medical attention following his seizure; (3) they forced him to live in unsanitary and unsafe housing conditions, conditions that included sewer and mold in his cell, the lack of sunlight in his cell, and no yard call; (4) they barred his access to the courts by denying him the standardized forms for commencing litigation pursuant to 42 U.S.C. 1983; and (5) they retaliated against him for filing a previous lawsuit. He asked, inter alia, that an earlier lawsuit, which the undersigned understands to be Hastings v. May, 2:09CV00187, be re-opened and joined with the one at bar.

---

[6] Hastings represents that May is the Sheriff of St. Francis County, Arkansas; Jones is a lieutenant in the St. Francis County Sheriff's Office and the head jail administrator; Wingo is a major in the St. Francis County Sheriff's Office; and Smith is a sergeant in the St. Francis County Sheriff's Office and "second in command at the jail." See Document 2 at 2.

The defendants eventually filed the pending joint motion for summary judgment. See Document 75. They maintained that they are entitled to judgment as a matter of law for the following reasons:

> Plaintiff can provide no proof of any constitutional violation while he was incarcerated at the St. Francis County Detention Center, and for several allegations, Plaintiff cannot prove that any of the named parties were personally involved. Specifically, Plaintiff cannot provide proof that any of the Defendants personally denied him any medication or necessary medical treatment, or that any Defendants were deliberately indifferent to his alleged serious medical needs. Furthermore, Plaintiff cannot provide proof of any unconstitutional conditions of confinement or that Defendants retaliated against Plaintiff for any reason whatsoever. Regardless, he cannot provide proof on any of his claims that the alleged constitutional violation was the result of an unconstitutional policy, practice, [or] custom of the St. Francis County Detention Center. …

See Document 76 at 1. For the reasons that follow, the undersigned agrees.

<u>HASTINGS' CLAIM THAT THE DEFENDANTS PREVENTED HIM FROM OBTAINING HIS SEIZURE MEDICATION AND EVEN GAVE HIM ANOTHER PRISONER'S MEDICATION</u>. Hastings maintains that the defendants prevented him from obtaining his seizure medication and even gave him another prisoner's medication. Specifically, he maintains that from April 30, 2012, until May 5, 2012, he was without his seizure medication and does not know whether his family brought his medication to the Detention Center during that period of time because he was allowed only one telephone call. He additionally maintains that on May 5, 2012, he was given a seizure medication by Sonny Pettis ("Pettis"), a Detention Center employee, but the medication belonged to another prisoner.

An official's deliberate indifference to a pre-trial detainee's serious medical need is proscribed by the Constitution.[7] Deliberate indifference is shown by evidence of a serious medical need and evidence that an official actually knew of but deliberately disregarded that need. See Meloy v. Bachmeier, 302 F.3d 845 (8th Cir. 2002). Deliberate indifference may be shown by an official "intentionally denying or delaying access to medical care or intentionally interfering with prescribed treatment." See Id. at 849. A supervisor is liable when he is personally involved in the violation or when his corrective inaction constitutes deliberate indifference toward the violation. See Id.

The undersigned accepts that Hastings had a seizure disorder, had been prescribed seizure medication, and had a serious medical need for it. The undisputed facts establish that from approximately the day he was incarcerated at the Detention Center, he looked first to his family members to provide him with his medication. Hastings was allowed to use a telephone at the Detention Center and was able to speak with his aunt about his medication. She was unable to find it in his belongings at her home. He attempted to contact his mother and sister about his medication, but his attempts to contact them were unsuccessful. There is no evidence that his aunt, mother, or sister later brought his medication to the Detention Center nor is there any evidence that prison officials later came to be in possession of his medication but refused to provide it to him. There is also

---

[7] Hastings is a pre-trial detainee. The Court of Appeals has repeatedly applied the same "deliberate difference" standard for pre-trial detainees as is applied to Eighth Amendment claims made by convicted prisoners. See Morris v. Zefferi, 601 F.3d 805 (8th Cir. 2010).

no evidence that he ever asked May, Jones, Wingo, or Smith for any seizure medication; Hastings certainly did not ask them for any such medication prior to May 6, 2012, the day he had his seizure. It appears that the first time he formally asked any official for seizure medication was May 7, 2012. On that day, he submitted a medical request for, inter alia, seizure medication. The undisputed facts establish that he saw a medical professional at the Detention Center's "mobile clinic" on May 8, 2012, and was given a seizure medication Hastings identified as Dilantin. There is no evidence the defendants intentionally interfered with his prescribed treatment by facilitating his failure to obtain it or by otherwise approving, condoning, or turning a blind eye to his failure to receive it.

On May 5, 2012, Pettis gave Hastings the seizure medication belonging to another prisoner. There is no evidence Pettis intended to harm Hastings by giving him the medication. Pettis' actions, while bordering on gross negligence, do not rise to the level of deliberate indifference. See Phillips v. Jasper County Jail, 437 F.3d 791 (8th Cir. 2006) (prisoner must show more than gross negligence). Alternatively, there is no evidence that May, Jones, Wingo, or Smith were personally involved in Pettis' decision to give Hastings the medication or that they took no corrective action once they were apprised of Pettis' actions. Alternatively, there is no evidence Hastings suffered any injury as a result of taking the medication. See Irving v. Dormire, 519 F.3d 441 (8th Cir. 2008) (Eighth Amendment requires an injury of some degree). He does not allege, and there is no evidence, that the medication caused him to have the seizure.

Hastings challenges Jones' assertion in her affidavit that she contacted the ADC to determine if ADC officials had any record of him being prescribed or taking seizure medication. She was told that their records did not indicate he had been prescribed or had taken seizure medication. He maintains she committed perjury because the medical records he submitted demonstrate that he has taken a seizure medication while incarcerated in the ADC. The records he submitted indeed establish that fact, but it is of no consequence. The undersigned accepts that Hastings had a seizure disorder and had been prescribed seizure medication prior to his incarceration in the Detention Center.[8]

<u>HASTINGS' CLAIM THAT THE DEFENDANTS FAILED TO ENSURE HE RECEIVED ADEQUATE MEDICAL ATTENTION FOLLOWING HIS SEIZURE</u>. Hastings next maintains that the defendants failed to ensure he received adequate medical attention following his seizure. Specifically, he maintains that the attending paramedics did nothing to treat the symptoms and/or consequences of his seizure and did not take him for emergency room care. He maintains that one of the paramedics even accused Hastings of faking the seizure. He maintains that when he regained consciousness following his seizure, he found himself laying in filth from a nearby sewer. He also maintains that he was denied medical attention for the back injury he sustained during the seizure.

The undisputed facts establish that Hastings had a seizure on May 6, 2012.

---

[8] Hastings also maintains that the ADC official who spoke with Jones about Hastings' medical condition violated the Health Insurance Portability and Accountability Act of 1996. It is not necessary for the undersigned to give serious consideration to that assertion because it is clear May, Jones, Wingo, or Smith had no control over the actions of the ADC official.

Someone at the Detention Center believed he was in distress because paramedics were called. They were attending to him when he regained consciousness. Although he maintains that they did nothing to treat the symptoms and/or consequences of his seizure, he has not identified what they failed to do. At most, Hastings maintains that they should have taken him for emergency room care. There are at least three problems with his assertion. First, he has failed to demonstrate why emergency room care was necessary. Second, there is no evidence that May, Jones, Wingo, or Smith were directing the paramedics' actions. Last, Hastings has failed to show that they prevented the paramedics from taking him for emergency room care. He does not know who made the decision not to take him for emergency room care, and Jones' unrebutted representation is that if the paramedics believed more treatment was necessary, Hastings would have been transported to the hospital. See Document 7, Exhibit B at 1.

Once Hastings regained consciousness following his seizure, one of the paramedics accused him of faking the seizure. There is no evidence that May, Jones, Wingo, or Smith believed likewise or that they were directing the actions of the paramedic. Even had they been directing his actions, his accusation does not give rise to a claim pursuant to 42 U.S.C. 1983. See King v. Olmsted County, 117 F.3d 1065 (8th Cir. 1997) (mere verbal threats do not constitute 1983 claim). Alternatively, there is no evidence the paramedic's belief caused him to treat the symptoms and/or consequences of Hastings' seizure any differently.

Once Hastings regained consciousness following his seizure, he found himself laying

in filth from a nearby sewer. He represents, and the undersigned accepts, that he laid in the filth for approximately forty-five minutes. There are at least two problems with his assertion, though. First, there is no evidence that May, Jones, Wingo, or Smith were personally involved in the decision to leave Hastings in such filth or took no corrective action once they were apprised of the paramedics and/or prison staff's decision to leave him there for such an extended period of time. Second, there is no evidence Hastings suffered any injury as a result of laying in the filth, save some considerable inconvenience.

On May 7, 2012, or the day after Hastings suffered his seizure, he submitted a medical request for, <u>inter alia</u>, medical attention for an injury to his back he sustained during his seizure. The next day, he was seen by a medical professional at the Detention Center's "mobile clinic." The medical professional refused to treat Hastings' back injury because the medical professional had been told not to address it. There is no evidence, though, that May, Jones, Wingo, or Smith instructed the medical professional to refuse to treat Hastings' back injury. In fact, he has no evidence who might have so instructed the medical professional.

<u>HASTINGS' CLAIM THAT HE WAS HOUSED IN UNSANITARY AND UNSAFE CONDITIONS</u>. Hastings next maintains that the defendants forced him to live in unsanitary and unsafe housing conditions. He maintains that the conditions included sewer and mold in his cell, the lack of sunlight in his cell, and no yard call.

A pre-trial detainee's challenge to the conditions of his confinement are analyzed

under the Fourteenth Amendment. See Stickley v. Byrd, 703 F.3d 421 (8th Cir. 2013). He is required to produce evidence that the conditions were serious enough to deprive him of the "minimal civilized measure of life's necessities" or evidence that the conditions constituted a substantial risk of harm. See Smith v. Copeland, 87 F.3d 265, 268 (8th Cir. 1996). In addition to the foregoing, he is required to produce evidence that an official was deliberately indifferent to the detainee's health and safety. See Id. In considering whether the conditions of his pre-trial detention were unconstitutionally punitive, the courts weigh the totality of the circumstances. See Morris v. Zefferi, 601 F.3d 805 (8th Cir. 2010). The courts consider, inter alia, the length of his exposure to the conditions and the severity of those conditions. See Owens v. Scott County Jail, 328 F.3d 1026 (8th Cir. 2003).

    Hastings was housed in the Detention Center's "B cell." The drain he complains about was not in the individual cell he resided in but was in the dayroom area of "B cell," an area the undersigned understands to be a communal living area where prisoner can do such things as watch television. The undersigned accepts that the drain overflowed from time to time. The undisputed facts establish that it was overflowing on the day he had his seizure, and his left leg was resting in the filth from the drain when he regained consciousness following his seizure. The undersigned also accepts that there was a growth of some kind in the individual cell he resided in, sunlight could not enter his cell, and he never had yard call during his stay in the Detention Center. Assuming that May, Jones, Wingo, or Smith bore responsibilities for these unpleasant conditions, they do not rise to

the level of a constitutional violation for at least two reasons. First, Hastings only experienced the conditions for a short period of time, specifically, for twelve days. He was incarcerated in the Detention Center from April 30, 2012, until he was transferred to the ADC's Omega Technical Violators Program in Malvern, Arkansas, on May 11, 2012. Second, the conditions themselves were not so severe as to deprive him of the minimal civilized measure of life's necessities nor did they constitute a substantial risk of harm. They were unpleasant but not intolerable. For instance, the overflowing drain was not located in his individual cell.

<u>HASTINGS' CLAIM THAT THE DEFENDANTS BARRED HIS ACCESS TO THE COURTS BY DENYING HIM THE STANDARDIZED FORMS FOR COMMENCING LITIGATION PURSUANT TO 42 U.S.C. 1983</u>. Hastings next maintains that the defendants barred his access to the courts. He maintains that they did so by denying him the standardized forms for commencing litigation pursuant to 42 U.S.C. 1983.

Pre-trial detainees, like all prisoners, have a constitutionally guaranteed right of access to the courts. <u>See</u> <u>Williams v. Wyrick</u>, 747 F.2d 1231 (8th Cir. 1984). "The fundamental concern is whether [the prisoner] is denied meaningful access to the court[s]." <u>See</u> <u>Id</u>. at 1232. The prisoner alleging a constitutional violation must produce evidence of an actual injury by demonstrating that the alleged shortcoming hindered his efforts to pursue a legal claim. <u>See</u> <u>Lewis v. Casey</u>, 518 U.S. 343 (1996) (alleged shortcomings in library or legal assistance program).

The undisputed facts establish that Hastings requested the standardized forms for

commencing litigation pursuant to 42 U.S.C. 1983 but was told there were no such forms at the Detention Center. Smith, in fact, told Hastings the following when he requested the forms: "Why do you want that for? You're ain't going to do nothing but get yourself in trouble, some more trouble." Although it is not clear when he obtained the forms, his failure to obtain them when he requested them does not rise to the level of a constitutional violation for at least two reasons. First, there is no evidence that May, Jones, Wingo, or Smith had the forms in their possession but refused to provide them to Hastings. Instead, the evidence is simply that there were no forms available at that time. Second, there is no evidence that he sustained an actual injury by having his efforts to pursue a legal claim hindered. He sought the forms sometime after May 6, 2012, the day of his seizure, and he signed the complaint at bar on May 18, 2012, <u>see</u> Document 2 at 5. Thus, at most, he had to wait twelve days to obtain the appropriate forms.

<u>HASTINGS' CLAIM THAT THE DEFENDANTS RETALIATED AGAINST HIM FOR FILING A PREVIOUS LAWSUIT</u>. Hastings next maintains that the defendants retaliated against him for filing a previous lawsuit. He maintains that they retaliated against him in the following respects: (1) by refusing to provide him with adequate medical care, (2) by refusing to provide him with the standardized forms for commencing litigation pursuant to 42 U.S.C. 1983, (3) by transferring him from the Detention Center, and (4) by a comment made to him regarding his failure to obtain an "own recognizance" or "OR" bond.

"Conduct that retaliates against the exercise of a constitutionally protected right

is actionable, even if the conduct would have been proper if motivated by a different reason." See Cody v. Weber, 256 F.3d 764, 771 (8th Cir. 2001) (access to the courts claim). The conduct itself does not need to be a constitutional violation; the violation lies in the intent to impede the exercise of the constitutional right. See Id.

Hastings has previously commenced litigation against May, Jones, and Smith. See Hastings v. May, 2:12CV00200 BSM, and Hasting v. May, 2:09CV00187 BSM. There is no evidence, though, that May, Jones, Wingo, or Smith retaliated against Hastings for filing those or other lawsuits. Specifically, there is no evidence May, Jones, Wingo, or Smith refused to provide Hastings with adequate medical care or otherwise delayed medication attention for him. He was seen by medical professionals on at least two separate occasions during his twelve day stay at the Detention Center. There is no evidence May, Jones, Wingo, or Smith possessed the standardized forms for commencing litigation pursuant to 42 U.S.C. 1983 but refused to give them to Hastings. Alternatively, he was not hindered in pursuing his legal claim against them. He requested the forms sometime after May 6, 2012, and he signed the complaint at bar on May 18, 2012. At most, he had to wait twelve days to obtain the appropriate forms. Although Hastings was transferred from the Detention Center after only twelve days, there is no evidence he was transferred because of his use of the federal courts to seek a redress of his grievances or because of a comment regarding, or in response to, his failure to obtain an "OR" bond. His assertions are nothing more than sheer speculation on his part.

VARIOUS OTHER ALLEGATIONS. A cursory examination of the record in this case

reveals a host of other allegations made by Hastings. For instance, he alleges that he was cursed by Smith shortly before departing the Detention Center and, in a submission other than his complaint, he alleges that one or more of the defendants have asked other prisoners to kill him. See Document 78, 79. These allegations need not be addressed because they do not constitute a cognizable claim, are outside the scope of his initial complaint, or involve complaints that arose in other correctional facilities.

RECOMMENDATION. On the basis of the foregoing, the undersigned recommends that the defendants' motion for summary judgment be granted. Hastings' complaint should be dismissed, and judgment should be entered for the defendants.

DATED this ___3___ day of April, 2013.

                                    UNITED STATES MAGISTRATE JUDGE